# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs July 10, 2012

## STATE OF TENNESSEE v. RANDY BOXLEY

**Direct Appeal from the Criminal Court for Shelby County**
**No. 10-04990     James C. Beasley, Jr., Judge**

---

**No. W2011-02054-CCA-R3-CD  - Filed July 16, 2012**

---

Following a jury trial, the defendant, Randy Boxley, was convicted of robbery, a Class C felony, and sentenced as a multiple offender to eight years in the Department of Correction. On appeal, he argues that the identification evidence was faulty, and without this, the evidence was insufficient to support his conviction. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Terita Hewlett Riley, Memphis, Tennessee, for the appellant, Randy Boxley.

Robert E. Cooper, Jr., Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Jose Leon, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

The victim, Cordell Watson, testified that three men robbed him of his gold chain, watch, and cell phone as he walked through the parking lot of Melrose High School on March 5, 2010, at approximately 11:20 a.m. Specifically, the victim testified that he noticed a blue Chevrolet Impala pulling up toward him as he walked through the parking lot. The victim heard footsteps coming from behind him, and, as he turned, two men forced him to the ground, and one of them hit him in the lip. A third man, whom the victim recognized, approached and "pat[ted]" him down. The victim's gold chain, watch, and cell phone were

forcibly removed by the three men. The men returned to the blue Impala and drove away as the victim ran after the car to retrieve the license plate number. The victim estimated that the incident lasted five to ten minutes.

The victim said that he subsequently viewed a photographic line-up after reading and signing the "Memphis Police Department Advice to Witness Viewing Photographic Display" form, which states that "persons pictured may or may not have anything to do with the suspect offense" and that "no one is to give [the witness] any hints or suggestions." The photographic display admitted into evidence showed six faces, one of which was the defendant's. The defendant's face is circled in red ink with the words, "One of the one's that rob me," written underneath. The victim's signature immediately follows, including the handwritten date and time: 4/2/2010 at 11:53 a.m. The victim denied circling the defendant's photograph, saying that the detective who interviewed him had circled it. The victim acknowledged writing the comment underneath the defendant's photograph and signing his name on the photospread. The victim also identified the defendant in court as one of the men who robbed him, saying he was "a hundred percent sure."

Sergeant Matthew Pugh of the Memphis Police Department testified that he obtained security footage from Melrose High School capturing the robbery. Although faces on the videotape were not discernible, the security footage confirmed that an assault occurred. Sergeant Pugh also testified that he ran the license plate number reported by the victim, but the number was invalid. However, he later received a phone call from the victim's grandmother, who reported that she saw the blue Impala at a club and wrote down the correct license plate number. Sergeant Pugh determined that the defendant was the registered owner of that vehicle.

Sergeant Pugh testified that the victim identified the defendant from the photographic line-up immediately, circled the defendant's photo, wrote his comment, and provided his signature and the date. Sergeant Pugh denied making any suggestions or helping the victim in any way with the identification.

Melanie Drisdale, the recordkeeper for Wendy's Restaurants, testified that the defendant was not at work the day of the robbery as he had previously claimed during the investigation.

The defendant did not testify or offer any proof.

## ANALYSIS

The defendant argues that the evidence is insufficient to support his conviction for

robbery.  He contends that the victim's identification of him was faulty for two reasons. First, the victim's testimony showed that he was an unreliable witness.  Second, the photographic identification procedures were compromised by the investigating officer, tainting the subsequent in-court identifications.

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact.  See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."  State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).  Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation.  The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand.  Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses.  In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

To support his first argument, the defendant references a list of factors set out in Neil v. Biggers, 409 U.S. 188 (1972), used to evaluate identification testimony.  The defendant also highlights portions of the witness's testimony in an effort to discredit his identification.

The jurors in the defendant's trial were instructed as to several different considerations in analyzing the credibility of eyewitness identifications:  (1) the witness's capacity and opportunity to observe the offender; (2) the degree of certainty expressed by the witness regarding the identification and the circumstances under which it was made; (3) the occasions, if any, on which the witness failed to make an identification of the defendant, or made an identification that was inconsistent with the identification at trial; and (4) the occasions, if any, on which the witness made an identification that was consistent with the identification at trial, and the circumstances surrounding such identifications.

The victim testified that the robbery lasted approximately five to ten minutes on the morning of March 5, 2010.  Although the victim did not know the defendant prior to the incident and had never seen him before, the victim had several minutes, up close and in the daylight, to view the defendant's face. The victim identified the defendant in a photographic line-up almost one month later and again in the courtroom.  Given these facts, a reasonable

jury could have found that the victim's identification testimony was credible.

The defendant asserts, for his second argument, that the investigating officer suggestively drew a circle around the defendant's face in the photographic line-up to help the victim make a positive identification, tainting the identification process.

As our supreme court has held, "[p]hotographs contained in a photographic array do not have to mirror the accused. Instead, the law simply requires that the police refrain from 'suggestive identification procedures.'" State v. Hall, 976 S.W.2d 121, 153 (Tenn. 1998) (quoting Neil v. Biggers, 409 U.S. 188, 196 (1972)). Accordingly, a photographic identification only becomes inadmissible, if, "based upon the totality of the circumstances, 'the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the accused] was denied due process of law.'" State v. Darrell Toomes, No. W2004-01739-CCA-R3-CD, 2005 WL 1541687, at *6 (Tenn. Crim. App. June 27, 2005) (quoting Stovall v. Denno, 388 U.S. 293, 301-302 (1967)). The risk of irreparable mistaken identification is heightened if one of the photographs in the photographic lineup "is in some way emphasized," or if "the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." Simmons v. United States, 390 U.S. 377, 383 (1968) (footnotes omitted).

The jury heard conflicting testimony between the victim and Sergeant Pugh as to which one of them circled the defendant's picture during the photographic line-up. In considering this issue, we will review the two testimonies in detail.

The prosecution entered the photographic line-up into evidence and proceeded to ask the victim questions relating to the line-up:

Q.      I'd like to publish what has been marked Exhibit No. 2 for the [S]tate. Did you draw that circle?

A.      I don't think I drew the circle but I did put my signature right there.

Q.      Is that your signature at the bottom?

A.      Yes, sir.

Q.      Is that the individual -- one of two [of] the individuals that came up to you on that day?

A.      Yes, sir.

-4-

On cross-examination, the victim was asked again about the photographic line-up:

Q.    Another point of clarification you stated when you did the, I guess the identification of [the defendant], that you did not circle his picture.  Is that correct?

A.    No, I did not.

Q.    Do you recall who circled it?

A.    The guy who interviewed me.

Q.    So the detective circled the picture?

A.    Uh-huh.

Q.    And then he asked you to write comments under that picture?

A.    Yes, ma'am.

The prosecution later called Sergeant Pugh to testify about the course of the investigation and the line-up identification:

Q.    And was [the victim] able to make a positive identification?

A.    He immediately picked out [the defendant] as one of the suspects that was involved in the robbery.

Q.    And did you help him in any way?

A.    No, sir.

Q.    Did you suggest to him in any way while he was there?

A.    No, sir.

Q.    Did you inform him that he was in one of those lineups?

A.    No, sir.

Q.      You did not?

A.      No. sir.

Q.      And as a consequence of the victim identifying [the defendant], what did you do?

A.      The victim circled the photograph of the suspect and signed his name to it and put the date and time on there, and then began to look for [the defendant].

Q.      And were you able to find [the defendant]?

A.      I was.  I was contacted by his wife . . . .

At the conclusion of the trial, the court instructed the jury as to how to consider conflicting witness testimony:

> Sometimes the testimony of different witnesses will not agree, and you must decide which testimony you accept.  You should think about whether the disagreement involves something important or not, and whether you think someone is lying or is simply mistaken.  People see and hear things differently, and witnesses may testify honestly but simply be wrong about what they thought they saw or remembered.  It is also a good idea to think about which testimony agrees best with the other evidence in the case.

Given this conflicting testimony by the State's witnesses, we now will consider whether the evidence is sufficient to sustain the defendant's conviction.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).  "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient."

State v. Tuggle, 639 S.W.2d 913, 914 (Tenn.1982).

To obtain a conviction for robbery, the State was required to show beyond a reasonable doubt that the defendant intentionally or knowingly committed a theft of property against the person of another by violence or putting the person in fear. See Tenn. Code Ann. § 39-13-401(a). The State presented the jury with security footage showing the robbery and testimony from the victim, who identified the defendant as one of his assailants and said that he had been robbed of his watch, gold chain, and cell phone. Additionally, the recordkeeper employed by Wendy's Restaurants verified that the defendant was not working on the day of the robbery. As was its right, the jury resolved any conflict between the testimony of the victim and Sergeant Pugh. Accordingly, we conclude that the evidence is sufficient to sustain the defendant's conviction for robbery.

## CONCLUSION

Based upon the foregoing authorities and reasoning, the judgment of the trial court is affirmed.

_____
ALAN E. GLENN, JUDGE